UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| STEPHEN H. DEMAREST AND DEBORAH A. DEMAREST, husband and wife,<br><br>     Plaintiffs,<br><br> vs.<br><br>CITY OF LEAVENWORTH, a municipal corporation;<br><br>     Defendant. | NO. CV-11-0072-JLQ<br><br>MEMORANDUM OPINION and ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

> *"Leavenworth, that Bavaria-inspired jewel of Washington State's Cascade Mountains, has become a favorite autumn tourist attraction...By car and bus load, until the last bright leaf flutters down, visitors will be converging on the little Icicle Creek town which pulled itself up by its boot straps a few years ago and emerged as an 'all-America city' much honored in national civic improvement competition."*

        ~ The Seattle Post Intelligencer, September 23, 1973

  Steven Demarest, an attorney licensed to practice in the state of Washington, brings this action on behalf of himself and his marital community, appearing *pro se*, seeking to have this court declare various City of Leavenworth sign code sections (LMC) to be in violation of the First Amendment of the United States Constitution. While the challenges appear to be blanket, specifically Demarest challenges the requirement of LMC 14.040, 170, and 180 that the design, lettering style, and color of signs be compatible with the "Old World Bavarian-Alpine theme" (hereafter "the Bavarian theme"). None of the

ORDER - 1

challenged Code provisions contain any restrictions on the actual message content of the sign.

Demarest is no stranger to legal challenges to municipal actions and codes and the consequences for bringing meritless lawsuits.  See *Brigade v. Economic Development Bd. for Tacoma-Pierce County*, 61 Wa. App. 615, 811 P. 2d 697 (1991).

In 2007 the Demarests purchased commercial property in the City of Leavenworth, Washington.  Almost immediately, Demarest refused to comply with the City's Municipal and Sign Codes on multiple occasions. On February 10, 2011, the Demarests filed this action in Chelan County Superior Court, appearing *pro se*, alleging that the applicable Codes violated the United States Constitution. The City removed the case to this court and answered the Complaint denying all liability.  Mr. Demarest is not admitted to practice in this court, although he is still an active member of the Washington State Bar Association.

On November 10, 2011 the parties stipulated to the dismissal of Plaintiffs' claims asserted in the initially filed Complaint (ECF No. 1) which were based upon the City's *former* sign code.  Plaintiffs were granted leave to file an Amended Complaint, asserting only claims relating to the newly enacted Leavenworth Sign Code which became effective on September 13, 2011.  The Amended Complaint, filed on November 10, 2011, seeks only injunctive and declaratory relief.  Plaintiffs challenge the constitutionality of sections of the Leavenworth Municipal Code (LMC), specifically   LMC 2.38 (Design Review Board); LMC 21.11 ("Appeals"); LMC 21.15 ("Hearing Examiner"); LMC 5.21 (on hawking);  LMC 14.10 (Sign Code); and LMC 14.08 ("Old World Bavarian Architectural Theme"). In addition, Plaintiffs challenge the Design Review Board Bylaws.  The Plaintiffs' specific causes of action are described in detail below.

Following oral argument the court has before it  cross-summary judgment motions of the parties (ECF Nos. 63, 68) on the Demarests' claims.  The City contends that its code provisions are constitutional, and serve to strengthen the Bavarian theme that has "put the City of Leavenworth on the map" and also further the City's substantial interests of aesthetics, tourism, and economic vitality.  The Demarests contend the LMC is

ORDER - 2

unconstitutional and that the Bavarian theme and the City Sign Code are commercially "burdensome, costly, and deprives [them] of message choice."

For the reasons which follow, the court GRANTS the City's Motion for Summary Judgment (ECF No. 68) and DENIES Plaintiffs' cross-motion.

## II.    SUMMARY JUDGMENT STANDARD

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* When parties submit cross-motions for summary judgment, as here, the court must consider each motion on its own merits. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  In addressing the parties' cross-motions for summary judgment, the court must draw all reasonable inferences in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 255 (1986)**.**  Nevertheless, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 248.  Factual assertions in the moving party's affidavits may be accepted as true unless the opposing party submits its own evidence to the contrary.

## III.    DEFENDANT'S MOTIONS TO STRIKE

Defendant has filed two Motions to Strike requesting that the court strike the majority of Plaintiffs' evidence filed in support and in response to the Summary Judgment Motions. The evidentiary objections are primarily line by line objections to Mr. Demarest's declarations (and exhibits therein referenced) based upon hearsay, improper legal conclusion or argument, lack of foundation, and relevance.   To the extent evidentiary material submitted by either party is inadmissible or irrelevant, the court, as a matter of course, has not factored that material into this decision.  Accordingly, the court

1  need not rule on the Defendant's line by line objections.

**IV.   FACTS**

**A.   Development of the City of Leavenworth as a Tourist Destination**

The City of Leavenworth is a code city (operating under the State of Washington Optional Municipal Code, (RCW ch. 35A)) located in Chelan County, Washington, at the base of the eastern slopes of the Cascade Mountains.  The town's elevation is 1100 feet, with surrounding rivers, canyons, and mountains rising to 8,000 feet nearby.  The City operates under a mayor/council form of government.  It was incorporated in 1906, and has a current population of approximately 2,000.

The record establishes that Leavenworth developed rapidly as a railroad and lumber town in the early 1900's, reaching a peak population between 1903 and 1913 of nearly 6,000. After the closures of local lumber mills and re-routing of the railroad in the 1920s, jobs and businesses disappeared from the area.  The economic downturn threatened to ruin Leavenworth.  The revitalization of the City began in 1962.  City residents began working with the University of Washington Bureau of Community Development and formed a committee called Leavenworth Improvement for Everyone (L.I.F.E.).  Ted Price and Bob Rodgers were drawn to the area by its natural beauty and became owners of an area restaurant and motel with a Bavarian theme.  They were involved in the LIFE tourism committee and promoted the idea of an Alpine theme for the town.  Ted Price believed the town could succeed as a tourist destination, and "wouldn't [let the idea] rest until it was realized in every minute detail," because he believed design was key to the theme's success  ECF No. 73, Ex. A. at xvii, 46, 173.   The idea of the theme was not derived from the actual heritage of its community members.  It was intended as a means to promote tourism to revitalize the City's economy.

In 1965, Hotel Edelweiss was the first building to remodel to reflect a Bavarian theme.   Others followed, voluntarily transforming business store fronts to a Bavarian-style.  In 1971, the City Council adopted its first Old World Bavarian Theme ordinance. Beautification projects and festivals developed. Today, the City is a pillar of tourism in the

Pacific Northwest.  The record states that some two million tourists annually visit Leavenworth and that festival attract as many as 50,000 tourists on a weekend.  It is undisputed that the City's considerable tourist industry is an (if not the) integral component of the City's economy.   In 2010, the City's businesses generated $107 million dollars in total sales, as compared to neighboring and comparable cities of  Cashmere ($31 million), Skyhomish($16 million), and Gold Bar ($10 million).  It is also undisputed that the Bavarian character of the City plays a special role in the City's charm, character, and economic vitality.   The City relies upon the Bavarian theme as a means to attract tourists and commerce.  Visitors are often drawn to the central commercial district which includes a pedestrian area on Front Street.

**B.    Plaintiffs' Commercial Building**

In 2007, Plaintiff purchased a building in the central commercial district of Leavenworth located at 321 9th Street.  Shortly thereafter he commenced his ongoing challenges to the City's Bavarian theme and its related Ordinances and Codes.  Numerous businesses operate within the building including inner-tube rentals, massage therapists, mental health counselors, consultants, general office, the Adventure Inn Hotel, and a beer garden (Der Hinterhof). The Adventure Inn Hotel and Der Hinterhof are owned and operated by the Plaintiffs.  Plaintiffs' building is several hundred feet away from the Front Street core pedestrian area.

**C.    The Challenged Provisions of the City Code**

The City's first codification of the Bavarian theme  was regarding architecture, which today is codified in LMC Ch. 14.08.  The City's first Sign Code was adopted in 1983.  Plaintiffs challenge a number of provisions of the Leavenworth Municipal Code, which Plaintiff has highlighted in an attachment to the First Amended Complaint. ECF No. 65.  The challenged Code provisions herein consist of certain portions of: LMC **2.38** (Design Review Board); LMC **21.1**1 ("Appeals"); LMC **21.15** ("Hearing Examiner"); LMC **5.21** (on hawking);  LMC **14.10** (Sign Code); LMC **14.08** ("Old World Bavarian Architectural Theme").  In addition, Plaintiff challenges the Design Review

Board Bylaws.

The Sign Code, LMC 14.10, has the following stated purpose:

...to promote the use of signs which are both functional and attractive in appearance through a sign regulation and permit system. This system is intended to permit such signs that will not, by their size, location, design, construction or manner of display, endanger the public safety of individuals, obstruct vision necessary for economy and business climate of the city of Leavenworth. Further it is recognized that Leavenworth is located in a valley with outstanding natural scenic beauty, and that this resource has been enhanced by adoption of the Old World Bavarian-Alpine theme. These two assets form the basis for Leavenworth's thriving tourist industry, upon which the city's economic health and general welfare so heavily depend. Signs complementing the Old World Bavarian-Alpine theme, as provided for in this chapter, form a key and indispensable part of the overall visual attractiveness of the city, and thereby contribute both to the aesthetic and economic well-being of Leavenworth.

LMC 14.10.010.    LMC 14.10.020 states that the Sign Code applies "within Leavenworth city limits and UGA [Urban Growth Area]..."  Only signs within the commercial districts are required to comply with the City's Bavarian theme.  LMC 14.10.040(A); 14.10.190. Specifically, the Sign Code prohibits erecting any sign within the City's commercial districts, which are "not compatible in design, lettering style, and color with the Old World Bavarian-Alpine theme."  The Sign Code further restricts off-site signs, signs within right of ways, signs with moving parts, portable signs, banners and balloons, neon signs, illuminated signs, bench signs, trailer signs, vehicle signs, roof signs, billboards, signs plastic-in appearance, and obscene signs.  Of import to this action is the court's finding that the Sign Code is content neutral.

Sign permits must be applied for and issued by the City, except in certain exempt circumstances.  Certain categories of signs are exempt from both the permit requirements and the Bavarian theme sign requirements:  Signs of a public body, noncommercial in nature, including public transit service signs, public utility information signs, traffic control signs, public warning signs, and all signs erected by a public officer in performance of a public duty; commemorative plaques; political election and free speech; warning signs; and signs located on residential property not in the commercial district. LMC 14.10.070.

Certain signs must comply with the Bavarian theme, but are exempt from the

permitting process of the Design Review Board (DRB), described below. Partially exempt signs are granted such status based on a number of considerations including but not limited to safety, time sensitivity, duration, aesthetics, location, and size. In addition to those listed above, they include: menu signs; flags; directional signs, construction signs, on-site portable signs, community bulletin structures, temporary "new' or "coming soon" signs, temporary "sale" and special product announcement signs, temporary transient business signs, incidental signs, real estate signs, special event signs, temporary community service event signs, illuminated window signs, nonilluminated window signs, and neon signs.

The DRB is a five-member board established by the City Council, in part to review applications for sign permits. DRB applications are reviewed by the DRB for compliance with applicable policies and design guidelines with a primary focus on the Bavarian theme. In determining whether a particular sign is subject to DRB approval, the City looks at location, zoning, and permit applicability. The DRB regulations and its authority and membership criteria are set forth in LMC Ch. 2.38, as well as in DRB Bylaws. To become a member on the DRB the individual must demonstrate "a fundamental knowledge of Bavarian-Alpine design" by meeting a certain number of criteria which include having traveled to Germany. LMC 2.8.010.

There is no time limit on the City's review process of a Sign Code permit application. LMC 21.07.050 states that within 28 days after receiving an application, the City shall complete the plan review of the application and provide the applicant a written determination that the application is complete or incomplete. On average, since 2009, the average number of business days from application completion to DRB meeting scheduled is 4.99 days; the average number of business days from application completion to the DRB meeting is 8.36 days; and the average number of business days from application completion to decision by the DRB is 11.988 days.

The City regularly enforces the Sign Code regarding non-compliant signs visible from the City right of way. It attempts to first obtain voluntary compliance. The

Demarests have on various occasions refused to comply with adopted codes, refused to obtain permits, and refused to adhere to DRB's request for additional information. The City has an administrative appeal process codified at LMC 21.11, which provides that an applicant may appeal administrative interpretations and decisions to the Hearing Examiner. Applicants can then appeal the Hearing Examiner's decision to the Chelan County Superior Court. LMC 21.11.040.

**D.    Demarests' History of Contact with the City Regarding the Sign Code**

Since purchasing their property, the Demarests have had ongoing contact with the City regarding their business signage. The Demarests have erected signs without applying for or obtaining permits as required. The first such contact occurred after the Demarests replaced the building's former sign with a new freestanding sign to advertise the Adventure Inn, without first applying for or obtaining a permit. The City informed them of the permit requirement and explained that the installed sign would not be approved because of its plastic appearance, phone numbers, web address, and smiley face logo. This sign became a subject of an August 2009 Notice of Violation issued by the City, which identified ten violations of the City's former sign code. The Notice concerned five banner signs, three off-site signs, a directional sign, as well as the freestanding Adventure Inn sign. The Demarests appealed the Notice of Violation and it was later withdrawn. During the pendency of this litigation, the Demarests also erected a sign above their breezeway roof, again, without initially applying for and obtaining a permit.

The Amended Complaint also alleges that City staff notified the Demarests that the following would violate the former city sign code: a computer monitor in a window (¶ 2.17), helium balloons tied to a fence (¶ 2.31), an electronic message center (¶ 2.51), and passing out flyers in the Front Street corridor without a permit (¶ 2.52).

**V.    ANALYSIS**

**A.    *Plaintiffs' Claims***

Though Mr. Demarest is a licensed attorney, Plaintiffs' claims are not clearly set forth either in the 44-page Amended Complaint or the Plaintiffs' Summary Judgment

ORDER - 8

briefing.  Construing the Amended Complaint in the Plaintiffs' favor, Plaintiffs' claims arise under 42 U.S.C. §1983 and assert that the LMC violates the First Amendment's Free Speech Clause because:

    1)    the Bavarian theme compels speech (¶ 3.3);

    2)    the Sign Code constitutes impermissible regulation of commercial speech based on content or viewpoint (¶ 3.5) ;

    3)    the Sign Code is underinclusive because it has so many exceptions which cast doubt on the nature of the City's asserted interest;

    4)    the Sign Code is overbroad (¶ 3.25);

    5)    the "unbridled discretion" of and lack of time limits upon the Design Review Board is an unlawful prior restraint on speech (¶ 3.14, ¶ 3.21);

In addition, the Amended Complaint appears to assert claims that:

    6)    The Bavarian theme (¶ 3.15) and the Sign Code's definition of a sign (¶ 2.30) are unconstitutionally vague in violation of the due process clause of the Fourteenth Amendment;

    7)    The City's enforcement of the Sign Code is arbitrary and discriminatory (¶3.16) in violation of equal protection clause of the Fourteenth Amendment; and

    8)    Design Review Board membership eligibility criteria violates the equal protection of the Fourteenth Amendment

Notably, the Amended Complaint requests the court to invaliate the entire Bavarian theme and Sign Code.

The parties have filed Cross-motions for Summary Judgment.

**B.    First Amendment Constitutional Standard**

***1. Commercial Speech vs. Non-Commercial Speech Distinction***

The degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or noncommercial speech.  *Bolger v. Youngs Drug Prods. Corp*., 463 U.S. 60, 65 (1983).  With respect to noncommercial

speech, "content-based restrictions [are permitted] only in the most extraordinary of circumstances." *Id*. However, "the Constitution accords less protection to commercial speech than to other constitutionally safeguarded forms of expression." *Id*. at 64–65. "[C]ontent based restrictions on commercial speech may be permissible." *Id*. at 65.

The parties agree that the proper classification of speech involved in this case is commercial speech.  *See* ECF No. 94. The Supreme Court has defined "commercial speech" as "speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc*., 533 U.S. 405, 409 (2001); *see also Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U .S. 557, 562 (1980) (defining "commercial speech" as "expression related solely to the economic interests of the speaker and its audience"); *Sorrell v. IMS Health Inc.,* 131 S.Ct. 2653, 2674 (referencing the "commonsense distinction between speech proposing a commercial transaction...and other varieties of speech..."). Plaintiffs own a commercial building, they are engaged in and raise concerns exclusively about commercial advertising, and they have an economic motivation for the speech.

The Supreme Court developed a framework for analyzing regulations of commercial speech in *Central Hudson*, which contains four interrelated elements:

> (1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny,
> (2) the State must assert a substantial interest to be achieved by restrictions on commercial speech;
> (3) the restriction must directly advance the state interest involved; and
> (4) it must not be more extensive than is necessary to serve that interest.

*See Central Hudson*, 477 U.S. at 566. "[T]he last two steps of the *Central Hudson* analysis basically involve a consideration of the fit between the legislature's ends and the means chosen to accomplish those ends." *World Wide Rush, LLC v. City of L.A.*, 606 F.3d 676, 684 (9th Cir. 2010).

The party seeking to uphold a restriction on commercial speech carries the burden of justifying it.  *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002).   In defending a First Amendment challenge to restrictions on commercial speech, the

government bears the burden of identifying a substantial interest directly advanced and justifying the challenged restriction. *Greater New Orleans Broadcasting Ass'n, Inc. v. U.S.*, 527 U.S. 173 (1999).

### 2. *Central Hudson Level of Scrutiny after Sorrell*

Plaintiffs agree the *Central Hudson* analysis applies, yet urge the court to apply strict scrutiny, as opposed to *Central Hudson's* intermediate level of scrutiny. They argue that the Supreme Court's most recent commercial speech case, *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653 (2011), has altered the *Central Hudson* analysis to require application of heightened scrutiny when the speech involved is not misleading or deceptive and the challenged law is "content-based." Under strict scrutiny, the governmental interest would have to be compelling (not just substantial) and the regulation precisely drawn. Defendant's briefs did not specifically discuss *Sorrell*, though they urge the court to apply an intermediate scrutiny and/or conclude the challenged restrictions are not content-based.

Though *Sorrell* is a significant opinion, it did not overturn the long line of Supreme Court precedent based upon *Central Hudson*. In fact, the *Sorrell* Court stated it was applying *Central Hudson*. *Id*. at 2653, 2669-72 and at 2667–68 ("To sustain the targeted, content-based burden § 4631(d) imposes on protected expression, the State must show at least that the statute directly advances a substantial government interest and that the measure is drawn to achieve that interest. There must be a 'fit between the legislature's ends and the means chosen to accomplish those ends.' "). Moreover, the Court determined that the Vermont law would not have survived either level of scrutiny, so the facts did not present a basis to completely overrule past precedent. Finally, it is unlikely that the Supreme Court would directly overturn a prior holding and drastically alter the level of scrutiny afforded under a foundational constitutional analysis without a thorough and comprehensive discussion heralding such an elemental change to the long standing and well-established constitutional framework.

### 3. *The Challenged Laws are Not Content-Based*

If the court must consider whether the challenged restriction is "content-based," the

court concludes the City of Leavenworth challenged provisions are not content-based. "Content" has been defined in the context of free speech doctrine as the *idea* or *viewpoint* expressed, not the manner in which it is presented. *See e.g., Moss v. U.S. Secret Service*, 675 F.3d 1213, 1224 (9th Cir. 2012)(speech is "viewpoint-based" if it distinguishes speech based on the viewpoint expressed or is motivated by the desire to suppress a particular viewpoint). The meaning of "content" in this context is important because in the broader sense of the term, as perhaps contemplated by Plaintiffs, a message's format, font, materials, placement, and manner of presentation, and so on, are "content" variables which secure attention and can even alter meaning. However if this broad definition were applied as the definition of a content-based law, all sign restrictions, except those governing blank signs, would be "content based."

Plaintiffs contend the challenged LMC provisions are in fact content-based "on two levels." ECF No. 64 at 7. First, Plaintiffs contend the Bavarian theme itself is a content-based restriction because "[a]nything non-Bavarian amounts to a disfavored message suppressed by the regulations." ECF No. 64 at 7. Plaintiffs' characterization is simply wrong. The challenged provisions of the LMC nowhere prohibit public discussion of anything "non-Bavarian." No provision restricts, nor can the City reject a sign permit application, due to the viewpoint it contains. The means used to enforce the Bavarian theme in the challenged provisions of the LMC are regulations of physical attributes (*see LMC* 14.10.180 referencing size, shape, number, placement, font, colors, etc). Though Plaintiff is correct that the Bavarian theme requirements go beyond requiring that a sign "look nice or professional and be maintained" (ECF No. 64 at 2), the actual provisions have nothing to do with any expressed viewpoint.

Secondly, Plaintiffs contend the Sign Code is content-based because some types of signs are regulated, while others are exempt, and the City must examine the speech before determining whether it qualifies under one of the exemptions. For example, Plaintiff points out that the Sign Code "regulates real estate signs different from restaurant signs different from construction signs and so on." The Sign Code does contain exemptions

from the permitting process for a number of certain types of signs: menu signs, flags and insignia of any government, signs of a public body (noncommercial in nature), directional signs, construction signs, political election and free speech signs, on-site portable signs, community bulletin board structure, temporary new or coming soon business signs, temporary "sale" and special product announcement signs, temporary transient business signs, incidental signs, real estate and/or open house signs, special event signs, residential development signs, temporary community service event signs, warning signs, private use signs, noncommercial signs located on a residence, illuminated window signs, nonilluminated window signs, and neon signs. LMC 14.10.050.

Taken as a whole, however, these exemptions in no way permit the City to discriminate against *ideas* it disfavors. *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006). The kind of cursory examination of speech to see whether it qualifies under the permit exemption is "not akin to an officer synthesizing the expressive content of the sign.*" Reed v. Town of Gilbert, Ariz.*, 587 F.3d 966, 978 (9th Cir. 2009). Most of these exceptions encompass the elements of "who" is speaking and "what event" is occurring, which Ninth Circuit precedent, and others, hold is content-neutral. *See G.K. Ltd. Travel*, 436 F.3d at 1076-78 (exemptions for "public signs, signs for hospital or emergency services, legal notices, railroad signs and danger signs" permissible); *Reed v. Town of Gilbert*, 587 F.3d 966, 977-78 (9th Cir. 2009) (exemptions for "directional signs" relating to certain qualifying events defined as "any assembly, gathering, activity, or meeting sponsored, arranged or promoted by a religious, charitable, community service, educational or other similar non-profit organization"); *Covenant Media of South Carolina v. City of North Charleston*, 493 F.3d 421, 434 (4th Cir. 2007) (to the extent enforcement of a sign ordinance that "defined and distinguished between different types of signs," including "directional or instructional signs," required "looking generally at what type of message a sign carries to determine where it can be located, this 'kind of cursory examination' did not make the regulation content based"); *La Tour v. City of Fayetteville, Arkansas*, 442 F.3d 1094, 1096 (8th Cir. 2006) (an exception to a sign ordinance's ban on

electronic message signs for "time and temperature" signs content-neutral); *Lamar Advertising Co. v. City of Douglasville, Georgia*, 254 F. Supp. 2d 1321 (N.D. Ga. 2003) (holding that city's sign ordinance provisions allowing government signs within public right-of-way, drive-through menu boards, subdivision designations, and directional signs did not constitute impermissible content-based regulations of speech under the First Amendment; provisions did not define permissible signs based on their content in that such signs had no viewpoint and merely relayed factual information).

Plaintiff cites to an Eleventh Circuit case, *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1266 (11th Cir. 2005), wherein the court held that Neptune Beach's sign code was content-based because of its varying treatments for different sorts of signs. The *Solantic* case adopts an overly narrow, restrictive view of the concept of "content-neutral" which differs from the Ninth Circuit and other precedent cited here.

As the challenged provisions are not content-based restrictions, *Central Hudson's* intermediate scrutiny applies to the matter *sub judice*.

**C.    Plaintiffs' First Amendment Claims**

*1.    Compelled Speech*

Plaintiff has moved for summary judgment on the claim that the Bavarian theme requirement is a form of compelled speech. ECF No. 64 at 2.  It has long been held that the First Amendment prohibits the government from compelling citizens to express *beliefs* that they do not hold. *R.J. Reynolds Tobacco Co. v. Shewry*, 384 F.3d 1126, 1134 (9th Cir. 2004).  The Supreme Court first recognized this element of First Amendment protection in 1943, ruling that school children could not be forced to recite the Pledge of Allegiance. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943).  "Government action that stifles speech on account of its message, or that requires utterance of a particular message favored by the Government....pose the inherent risk that Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion" and "'raise the specter that the Government may effectively drive certain ideas or viewpoints

from the marketplace." *Turner Broadcasting System, Inc v. F.C.C.*, 512 U.S. 622, 642 (1994).

Plaintiffs assert that the Bavarian theme compels them to "directly advance[] the culture of Bavaria" and an aesthetic the City wants to advance.  ECF No. 94 at 9.  In support of their claim, Plaintiffs cite *J. Reynolds Tobacco Co. v. United States FDA*, 2012 WL 653828 (D.D.C. 2012).  The *Reynolds* case concerned an FDA rule on tobacco companies requiring textual and color graphic images warnings to address consumer awareness of tobacco's serious health risks.   The district court found the graphic warning unconstitutional compelled speech because it conveyed false and misleading information about smoking and also because the government also failed to consider other alternatives that are less restrictive and burdensome.

The *Reynolds* case is not analogous to the circumstances here.  Plaintiffs are not forced to state any particular message as in the mandatory health-related message in the cited case.  Indeed, the Bavarian theme does not compel Plaintiffs to engage in any speech, nor does it regulate the speakers' beliefs, message, ideas or viewpoints.   The Bavarian theme requirement only controls certain physical characteristics of the voluntarily chosen message including size, location, number, lettering, and colors.  LMC 14.10.050. For the same reasons the court concludes the Bavarian theme is not content-based and the restrictions are not a form of "compelled speech."

**2.      *Whether the Challenged Restrictions Pass Muster under Central Hudson***

The four-part test *Central Hudson* test is: (1) if the communication is neither misleading nor related to unlawful activity, then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny, (2) the State must assert a substantial interest to be achieved by restrictions on commercial speech; (3) the restriction must directly advance the state interest involved; and (4) it must not be more extensive than is necessary to serve that interest.  The parties agree the proposed commercial speech of the Plaintiff is not misleading nor related to unlawful activity.  It is the second, third and fourth prongs which are in dispute.

ORDER - 15

*a.      Prong 2: Government Interest*

The interests the City seeks to advance through the provisions of the Bavarian theme, the Sign Code, and the Design Review Board are aesthetics, tourism, traffic/pedestrian safety, and economic vitality.  The City contends the measures were adopted to ensure compliance with and the continued viability of the Bavarian theme.  It is undisputed that the Bavarian theme attracts tourists to the City. Declarations in the record of the City's Mayor and its City Councilmembers, state that the City's economic vitality depends "almost entirely on maintaining the charm and beauty associated with the Bavarian theme."

Plaintiffs do not contest that aesthetics, tourisim and economic development are substantial government interests.  ECF No. 64 at 5.  Indeed, such asserted interests have been found to be at least "substantial," and the City has cited to numerous cases supporting such findings. In *Center for Bio-Ethical Reform, Inc. v. City and County of Honolulu*, 455 F.3d 910, (9th Cir. 2006), the court upheld Honolulu's long-standing laws prohibiting aerial advertising and regulating outdoor advertising in order to protect the views that "made the area famous."  The ordinance at issue was "designed to protect what is perhaps the state's most valuable and fragile economic asset-the natural beauty upon which Hawaii's tourism economy relies...Studies, and common sense, indicate that the scenic beauty of Hawaii is one of the primary factors weighed by potential visitors when determining whether to spend their vacation dollars in Hawaii or another locale."

Plaintiffs contend the facts here are distinguishable from the case authority upholding restrictions for the preservation of historical sites or natural beauty, as in Honolulu. Plaintiffs contend that unlike those assets, the Bavarian theme is an "artificial""made up" asset and therefore deserving of less protection.  Despite Plaintiffs' own consternation with the artificial-nature of the Bavarian theme, it nevertheless, like the beaches of Hawaii, has evolved to be a major economic and aesthetic asset, which the City has clearly demonstrated it has a substantial interest in protecting.

*b.      Prongs 3 and 4: The "Fit": Whether the restrictions directly advance the substantial interest and whether the restrictions are not more extensive than*

*necessary*

Turning to the third element of the commercial speech test, the court next considers whether the government's interests are directly advanced by the challenged provisions. The Supreme Court has noted that "[t]his burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188, (1999) (citation omitted). Therefore, "the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Id.* (*quoting Central Hudson*, 447 U.S. at 564). This inquiry focuses on whether the regulation advances the governmental interest in its general application, not specifically with respect to a particular speaker. *See Vanguard Outdoor, LLC v. City of L.A.*, 648 F.3d 737, 742–43 (9th Cir. 2011).

With regard to the fourth and final prong, the Supreme Court has clarified that this requirement does not demand that the government use the least restrictive means to further its ends. Rather,

> what [precedent] require[s] is a fit between the legislature's ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served; that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.

*Bd. of Trustees of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (internal quotation marks and citation omitted).

Relevant to *both* the third and fourth prongs of *Central Hudson* is the issue of whether the ordinance is impermissibly underinclusive. *Metro Lights, LLC v. City of L.A.*, 551 F.3d 898, 907 (9th Cir. 2009). A ban on speech "may be constitutionally underinclusive under *Central Hudson* when it has exceptions that undermine and counteract that interest the government claims it has adopted the law to further because such a regulation cannot directly and materially advance its aim." *Vanguard*, 648 F.3d at 742 (quotations and citation omitted). Such a regulation is barred in two situations: "(1)

first, if the exception ensures that the regulation will fail to achieve its end, it does not materially advance its aim; and (2) second, exceptions that make distinctions among different kinds of speech must relate to the interest the government seeks to advance." *Id.* In the *Metromedia v. City of San Diego*, 453 U.S. 490, 512 (1981), the Supreme Court rejected an argument that the city "denigrate [d] its interest in traffic safety and beauty and defeat[ed] its own case by permitting onsite advertising and other specified signs" while banning offsite advertising. 453 U.S. at 510–11. The Supreme Court concluded that the law's non-application to one type of sign, offsite advertising, did not alter the direct relation between the city's goals and the ban's application to those signs. *Id.* at 511.

When reviewing regulations, "[e]xceptions cannot be viewed in isolation or parsed too finely; the exceptions must be looked at holistically in the context of the entire regulatory scheme." *Vanguard Outdoor*, *LLC v. City of Los Angeles*, 648 F.3d 737 (9th Cir. 2011). The court must defer to the reasonable legislative judgement of the City on how best to advance its own substantial interests. Contrary to *Vanguard Outdoor*, Plaintiffs have essentially used this as a forum to parse the Bavarian theme provisions of the LMC, the Sign Code, and the DRB code provisions line by line, phrase by phrase. Their primary claims are that 1) their commercial speech is treated differently from non-commercial speech; 2) distinctions are made between on-premise and off-premise commercial speech, and 3) the City has simply gone to far with its laws than necessary to advance its interests is aesthetics, tourism, and safety. The court has reviewed the challenged restrictions and  addresses them in summary fashion below. The court concludes the restrictions do not violate *Central Hudson*.

    *i)*    <u>Sign Code: Temporary Community Service Event Signs</u>

Plaintiffs contend that the Sign Code violates the First Amendment by according fewer restraints on signage related to Temporary Community Service Events (TCSE). The code defines "community service event" as "an event (e.g., festival, parking, fun run and/or meeting) sponsored by or for the benefit of a nonprofit organization." LMC 14.10.210. For example, TCSE signs can be up to 32 square feet, can be portable and off

site.  TSCEs are exempt from the restriction on banners applicable to Plaintiffs.  Though TCSEs are exempt from the permit requirement, there are fourteen (14) restrictions listed for them.  Defendant states the TCSE function of the sign code is intended to address a community-wide need in order to help "visitors navigate community events in an efficient manner."  That TCSE *non*commercial speech enjoys fewer restrictions than Plaintiffs' commercial advertising is consistent with the law.  *See e.g.,  Reed v. Town of Gilbert, Ariz.*, 587 F.3d 966 (9th Cir. 2009)(upholding ordinance exempting religious, charitable, community service, educational or other similar non-profit organizations "speaking through the sign").  Noncommercial speech is consistently accorded more protection.

ii)    <u>Sign Code: Portable Sign Restrictions</u>

Plaintiffs' use of on-site portable signs are restricted under the Sign Code to four square feet in size.  LMC 14.10.050.G.  However, the portable sign restrictions for constructions signs (can be up to 32 square feet), real estate signs (can be five feet), TSCE (can be up to 32 square feet on private property), and political signs (which need not comply with OWBAT) vary.   Plaintiffs contend the varying restrictions are out of touch with "common sense and reason," though Plaintiffs recognize political speech must be accorded less restriction.  ECF No. 64 at 14.  Plaintiffs' also complain that they are restricted to only one portable sign per parcel, yet there are multiple businesses in their building.

Defendant states the City has an interest in allowing larger constructions signs to "promot[e] development and improv[e] its City."  Such signs are subject to numerous other restrictions.  As for real estate signs, the City indicates the 1-foot size difference will be noted and changed in the next amendment schedule.  As to the per parcel restriction, the City indicates it has a substantial interest in ensuring its sidewalks are not riddled with portable signs – for safety and aesthetic reasons.

iii)    <u>Off-site Portable Sign Restrictions</u>

The use of off-site signs (signs placed off the premises) are prohibited by the LMC Sign Code "except for political signage, campaign signs, or other protected First

Amendment signs in the public forum portion of the rights-of-way or when located within designated sign areas, community bulletin boards, and signs of a public body." LMC 14.10.040.B.  Plaintiffs call this restriction "draconian and unwarranted suppression of commercial speech," as it doesn't just restrict billboards, but even prevents Plaintiffs from even posting posters in businesses with more foot traffic.   The First Amendment does not bar a City from choosing to "value one kind of commercial speech-- onsite advertising -- more than another kind of commercial speech -off-site advertising.*  Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 512 (1981).   The ban does not discriminate between types of speech, and directly relates to the City's concerns with aesthetics. *See e.g., Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (9th Cir. 2009) (in an action brought by a company owning and operating billboards, the Ninth Circuit upheld a ban on offsite commercial advertising based on commercial speech doctrine analysis).

   *iv)    Prices*

   The Sign Code's definition of sign states that "sign" does not include "unpriced stock in trade on display and available for sale."  LMC 14.10.210.N. Plaintiffs interpret this definition to mean that the "entire surface" of *priced* stock in trade constitute "signs" under the Sign Code and must be "Bavarianized." Plaintiffs suggest the Sign Code "ban[s] price tags" and question "what possible interest does the City have in keeping consumers in the dark on prices?" ECF no. 64 at 31.  The City contends that Plaintiffs misinterpret the Sign Code and the "city does not rely on absurd constructions of code language in its enforcement." A more plausible interpretation, the City contends, is that price tags on the *priced* stock in trade on display and visible from public right of way, would need to meet the Bavarian theme.  Plaintiffs' objection regarding price tags is trivial and a likely misinterpretation of the Sign Code, which does not render the Sign Code unconstitutional.

   *v)    Logos*

   Under the Sign Code, signs in the commercial district, including logos, must comply with the Bavarian theme.  Plaintiffs assert this violates the Lanham Trademark Act, however Plaintiffs have not pleaded a basis for standing to assert such a claim.

*vi)*    <u>*Menus*</u>

Under the Sign Code, "menu signs" on display are exempt from the permitting process, however, they must comply with the Bavarian theme, and the menu displayed must be the same that is given to customers.  LMC 14.10.050.A. Plaintiffs contends it is "beyond absurd" to require menus to comply with the Bavarian theme.  However, it is clear to the court that the content is not regulated.

*viii)*    <u>*Incidental Signs*</u>

An "incidental sign" is defined under the Sign Code to mean "a sign, emblem, or decal informing the public of the property address, business hours, facilities or services available on the premises (e.g., open/closed signs, restroom signs, and bank card signs). LMC 14.10.210(14).  According to the code "all such signs" must be compliant with the Bavarian theme.  Moreover, "such signs shall not exceed a total combined area of two square feet per business."  Plaintiffs complain that pay stall signs in a parking lot would clearly exceed the provision's overly narrow size limitation and a literal reading of the way the code reads might suggest it the provision applies to incidental signs the inside of a business.  The City states it does not enforce its Sign Code on signs not visible from private right of ways. Again, Plaintiffs' challenge presents a trivial argument, which does not present a basis invalidate the Sign Code on constitutional grounds.

*ix)*    <u>*Temporary Sale and Product Announcement Signs*</u>

"Temporary sale and special product announcement signs" are not allowed at a business location more than three times per calendar year, and must be removed no later than 15 days after initial posting.  LMC 14.10.050.J.  The City specifically asserts this time restriction "serves the City's interests in aesthetics and safety in preventing a proliferation of special event signs and contemplates those businesses that have constant sales."  Since the regulation does not affect signage *within* a business (or visible from a public right of way), the City argues it is a proper fit.

*x)*    <u>*Street Musicians*</u>

Finally, Plaintiffs claim the absurd "zeal" in furthering the Bavarian theme is

ORDER - 21

evident in the restrictions on hawking.  The City Code requires application for a special use permit in order to "hawk[] services, entertainment, and musical performances" in the central commercial district.  The Code indicates in reviewing such a permit application the City Council should consider whether appropriate Bavarian dress, music, and design are utilized.  LMC 5.21.020.D.

Defendant contends the court should not consider this argument because the argument references LMC 5.36.060I, which is not referenced or pleaded in the Amended Complaint.  The Amended Complaint does however discuss hawking at ¶ 2.52 and its attachment highlights the hawking provision at LMC 5.21.020.

### c. The City's Restrictions do not Violate Central Hudson

Analyzing the challenged restrictions in a holistic manner, there is a reasonable fit between the Bavarian theme, the Sign Code, and the DRB permitting process which are rationally linked to substantial and legitimate objectives of the City in preserving tourism, aesthetics, and their economy.

### 3.    Overbreadth

Plaintiffs' also contend the Sign Code is overbroad (¶ 3.25).    An overbreadth claim is essentially a claim that a statute may be constitutional as applied to the Plaintiff but sweeps so broad as to unconstitutionally suppress the speech of others not before the court. *See Taxpayers for Vincent*, 466 U.S. 789, 798 (1984).

In the Summary Judgment Motion, Plaintiff  argues specifically that the definition of "sign" is overbroad.  The LMC defines a "sign" as "a communication device, structure, or fixture, which incorporates graphics, symbols, or written copy that is intended to promote the sale of a product, commodity, or service, or provide direction or identification for a premises, business, or facility. LMC 14.10.210N.   "Sign" does not include actual unpriced stock in trade on display and available for sale. *Id.*  "Sign" includes all structural members and, without limitation the following types of signs..." *Id.*  The definition section goes on to list 35 different types of signs.

Plaintiff claims the term "sign" lacks definition an ordinary person can sufficiently

1  understand and comply with.  The ordinance is not overbroad, and Plaintiffs' have simply

2  failed to state a plausible First Amendment violation based on the specifically defined

3  term "sign."

4  *4.    Prior Restraint*

5  Both parties also seek summary judgment on Plaintiffs' claim for violation under

6  the First Amendment's prior restraint doctrine.  Plaintiffs claim the prior restraint is the

7  requirement that a sign be approved before put into use coupled with Design Review

8  Board's "unbridled discretion" and a lack of decision making time limits (¶ 3.14, ¶ 3.21).

9  The Ninth Circuit recently noted, however, that "[i]t is an open question whether the prior

10  restraint doctrine even applies to commercial speech." *Hunt v. City of Los Angeles*, 638

11  F.3d 703, 718 n. 7 (*citing Central Hudson*, 447 U.S. at 571 n. 13, 100 S.Ct. 2343 ("We

12  have observed that commercial speech is such a sturdy brand of expression that traditional

13  prior restraint doctrine may not apply to it.")).  Defendant contends the doctrine does not

14  apply, and urges the court to dismiss the claim.

15  The court need not resolve the debate over whether the prior restraint doctrine

16  applies in the commercial speech context, because even assuming it does apply, the court

17  is unpersuaded by Plaintiffs' position. "A 'prior restraint' refers to an ordinance that either

18  'vests unbridled discretion in the licensor' or 'does not impose adequate time limits on the

19  relevant public officials.'" *Id*. at 718 (*quoting Get Outdoors II, LLC v. City of San Diego*,

20  506 F.3d 886, 894 (9th Cir. 2007).

21  Sign permitting schemes have been routinely upheld.  Though the criteria for

22  compliance with the Bavarian theme appear somewhat elastic and require reasonable

23  discretion of the DRB, the lack of rigid definitions of the Bavarian theme does not make

24  the Sign Code an unconstitutional prior restraint.  *Outdoor Media Group Inc. v. City of*

25  *Beaumont*, 506 F.3d 895, 905 (9th Cir. 2007); *Ward v. Rock Against Racism*, 491 U.S.

26  781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("While these standards are

27  undoubtedly flexible, and the officials implementing them will exercise considerable

28  discretion, perfect clarity and precise guidance have never been required even of

regulations that restrict expressive activity.").  The LMC sign permitting process reflects the City's overall legitimate interest in aesthetics:  The DRB is made up of members who are knowledgeable of the theme and the City has created a portfolio of photos designed to assist permit applicants in understanding what is compatible with the theme.  There is no evidence of the City's untimely action in the permit review process, but most importantly, the LMC contains multiple procedural safeguards: Any person may request administrative interpretations of the Sign Code (LMC 14.10.140) or seek administrative and judicial review of the decisions made by the DRB.

**D.    Due Process/Vagueness**

Plaintiffs also contend the Bavarian theme (¶ 3.15) and the Sign Code's definition of a sign (¶ 2.30) are unconstitutionally vague.  Though Plaintiffs merge their overbreadth and vagueness challenges, vagueness is not an outgrowth of the First Amendment, but rather the Due Process Clause of the Fifth Amendment (applied to the states through the Fourteenth Amendment), and therefore the court separately analyzes this claim.  An ordinance may be void for vagueness because either it (1) fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited;" (2) "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application;" or (3) "abut(s) upon sensitive areas of basic First Amendment freedoms, [ ] operat[ing] to inhibit the exercise of (those) freedoms."  *Grayned v. City of Rockford*, 408 U.S. 104, 108, (1972).

Plaintiffs' vagueness challenge is likewise unfounded.  A review of the ordinance reveals there is very little lack of clarity in the Bavarian theme or the Sign Code. Plaintiffs' complaints in that regard are  not of constitutional magnitude, but rather simply evidence their disdain for valid restrictions in their commercial advertising in the name of a substantial City interest they do not personally like.  The feelings harbored by the Demarests do not provide grounds for this court to constitutionally invalidate the LMC.

**E.    Equal Protection**

Finally, Plaintiffs' Amended Complaint and response to Defendant's Motion for Summary Judgment raise claims that the City's enforcement of the Sign Code is arbitrary and discriminatory (¶3.16) and that Design Review Board membership eligibility criteria violates the Equal Protection Clause of the Fourteenth Amendment (ECF No. 94 at 19). Defendant asks the court to ignore these claims, as Plaintiffs do not plead, cite, nor analyze the Fourteenth Amendment or even mention "equal protection."

Under the Equal Protection Clause of the Fourteenth Amendment, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   This type of claim is only actionable if enforcement is made in retaliation for the exercise of a constitutional right, such as free speech.  A claim for denial of equal protection will lie in a relatively small number of cases where an individual is subjected to spiteful actions taken by governmental authorities for reasons wholly unrelated to any legitimate governmental objective.  In this instance, there is <u>no</u> evidence Plaintiffs were unfairly targeted.  Instead, the record shows Plaintiffs purposely violated the City Code in order to provide grounds to challenge its constitutionality.

As to the issue of Design Review Board Membership, violations of equal protection are not linked to some right to public service, but rather to the unassailable right to be free from invidiously discriminatory qualifications. *Turner v. Fouche*, 396 U.S. 346 (1970). Plaintiffs lack standing or legal grounds to assert this claim under these facts.  Plaintiffs have not demonstrated they are in any protected class, or that they have applied for membership on the Design Review Board. *Turner*, 396 U.S. at 361-362, n. 23 (1970) (plaintiff who did not own property had standing to challenge property ownership requirement for membership on school board even though there was no evidence that plaintiff had applied and been rejected).

## VI.   CONCLUSION

Plaintiffs have made clear that they disfavor any government sign regulation on their commercial property. However, "[n]o well-ordered society can leave to the individuals an absolute right to make final decisions, unassailable by the State, as to

ORDER - 25

everything they will or will not do. The First Amendment does not go so far." *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943). Municipalities must have some leeway in determining the appropriate means to further their legitimate governmental interests.  Here, there is no restriction on the message or content of the message on the Plaintiff's signs. Where the City's ends are aesthetics, tourism, economics, and safety, and the means have included regulation of the size, placement, design, number, and duration of signs, there appears to be a reasonable fit.  Though no municipal code is perfect, perfection is not required.

The LMC restrictions on commercial advertising may not allow the Plaintiffs the optimum exposure they desire, nor allow them to ignore the Bavarian theme, however, Plaintiffs are free to choose their message and have many methods of advertising available to them -- should they choose to actually utilize the process made available to them by the City.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiffs' Motion for Summary Judgment (ECF No. 63) is **DENIED**.

2. Defendant's Motion for Summary Judgment (ECF No. 68) is **GRANTED**.

3. Defendant's Motions to Strike (ECF No. 90, 103) are **DENIED** as **MOOT**.

**IT IS SO ORDERED**.  The Clerk is hereby directed to enter this Order,  enter JUDGMENT dismissing the First Amended Complaint and the claims therein with prejudice, furnish copies to counsel, and close the file.

**DATED** this 27th day of June, 2012.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE